UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Jerrod Drumgoole

RECEIVED
MAR 2 0 2014
PRO SE OFFICE

*(In the space above enter the full name(s) of the plaintiff(s).)*

COMPLAINT

-against-

City of New York, P.O. CV 14
J. Santana shield #2

Jury Trial: 1918

P.O. Jason Vasquez shield # PSA1 4417
N.Y.P.D. 72nd Precient

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

I.     **Parties in this complaint:**

A.     List your name, address and telephone number.  If you are presently in custody, include your identification number and the name and address of your current place of confinement.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper as necessary.

Plaintiff     Name     Jerrod Drumgoole
              Street Address     A.M.K.C.
              County, City     18-18 Hazen Street
              State & Zip Code     East Elmhurst, New York 11370
              Telephone Number     N/A

B.     List all defendants.  You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual.  Include the address where each defendant may be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets of paper as necessary.

Defendant No. 1     Name     City of New York
                    Street Address

*Rev 05/2010*

County, City _____
State & Zip Code _____
Telephone Number _____

Defendant No. 2   Name _P.O. Jason Santana shield# 27987_
                  Street Address _830 4th Avenue N.Y.P.D 72nd Precint_
                  County, City _Brooklyn, New York_
                  State & Zip Code _____
                  Telephone Number _____

Defendant No. 3   Name _P.O. Jason Vasquez shield#PSA1 4417_
                  Street Address _830 4th Avenue  N.Y.P.D 72nd Precint_
                  County, City _Brooklyn, New York_
                  State & Zip Code _____
                  Telephone Number _____

Defendant No. 4   Name _____
                  Street Address _____
                  County, City _____
                  State & Zip Code _____
                  Telephone Number _____

II.   **Basis for Jurisdiction:**

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.   What is the basis for federal court jurisdiction? *(check all that apply)*

☑ Federal Questions          ☐ Diversity of Citizenship

B.   If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right
     is at issue? _Deprivation of 4, 8, & 14th_
     _U.S.C.A rights_
     _____

C.   If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

     Plaintiff(s) state(s) of citizenship _____
     Defendant(s) state(s) of citizenship _____

III.   **Statement of Claim:**

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events.

Rev. 05/2010

You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    Where did the events giving rise to your claim(s) occur? *in the county of Brooklyn, N.Y. on the 4th Between Church Ave & Albarannable*

B.    What date and approximate time did the events giving rise to your claim(s) occur? *July 29th 2011 at 6:50 p.m*

C.    Facts:

| | |
|---|---|
| **What happened to you?** | |
| **Who did what?** | |
| **Was anyone else involved?** | |
| **Who else saw what happened?** | |

*See attached Statement of Facts*

## IV.    Injuries:

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.

*Left shoulder contusion. Collar bone fracture black and blue abrasions and lacerations on lower back right back arm/fore arm swollen Jaw ankle (injury) see attach document(s) medical report.*

Rev 05/2010

## "STATEMENT OF FACTS"

Plaintiff JERROD DRUMGOOLE,On July,29th,2011 at approximately 6:50 p.m.

Was arrested at the  Location of E.4th Street between Church AVe & Alber-

marle Road. in the County of Kings,New York, for a alleged criminal offense

Penal Law violation#160.15 by P.O.J.SANTANA,and P.O.VASQUEZ.

While in the commission of effecting the arrest upon plaintiff.P.O.J.Santana,

Forcibily removed plaintiff out of his vehicle,once plaintiff had voluntarily

Complied with the P.O.request to step out of the vehicle.and was in the act

Of stepping out of the driver's side position.  Plaintiff made several inquiry

As to why his vehicle was being subjected to Stop & Questioning?

Once plaintiff was removed from the vehicle P.O.J.Santana,began to use foul

Obscene profanity language. Calling plaintiff a"Motherfucker" and continued

3.) To get physically aggressive and failed to explain at that precise

Moment why he was effecting the arrest? As plaintiff had motion to

Turn his head around to speak to the officer without using his body

Or,other counterparts,P.O.J.Santana,then immediately summons several

Bystanders to intervene and help restraint plaintiff who was not at

The moment resisting the initial contact by P.O.Santana, as the officer

Signaled the pedestrians walking past the area(2) individual's intervene

And began placing plaintiff in several restraint holds around his neck,

And footankles.

4.) As a result of this manuever plaintiff was forcibily thrown upon the

Concrete pavement,as the officer's handcuffs were secured around his

Wrists. as the plaintiff layed motionless across the pavement ground.

P.O.J.SANTANA,commenced to using a series of unnecessary extreme excessive

Use of Force by striking plaintiff multiple times in the face,torso,and

With the defensive Baton Asp.Weapon.

Next P.O.Santana,continued his assault while plaintiff was on the ground

By kicking plaintif in the jawbone causing extensive swelling lacerations

Upon the lips.P.O.Santana,proceeded to use a alternative use of force by

Pepper spraying Mace into his eyes.

As a result of the excessive use of force plaintiff received serious body

Substantial permanent injuries. That regards to a fractured dislocated left

Collar bone,black & blue abrasions on lower right back,and right arm,along

With fore arm.

Plaintiff received medical treatment for the injuries at Lutheran Medical

Hospital in Brooklyn,New York,on JUly,29th,2011.

) Treatment consisted of X-Ray's examinations, MRI's, Radiology examines,
CAT-SCAN, Pain scale test's. Followed by proscribed medications for
Severe excruciating Pain symptoms regarding Moltrons Tablets Medicines.
EKG Examinations was conducted. A contusion swelling was noted in the
Examination report upon the left side shoulder. Along with severe aches
Of continuous pain throughout the body.

10.) P.O.Santana, confirmed the improper use of force when he testified at the
Plaintiff criminal court trial.when A.D.A. Ms.Kurtzberg, Esq. had direct
Examination question P.O.Santana, to the effect about using force upon
The plaintiff.He stated "That is when I decided to use my Asp".a weapon
Issued by the N.Y.P.D.Department. Which is a"Collapsable Stick" See,
Exhibit_-A.(Trial Stenographer Minutes Page#185/Line#14-25.

l.) Plaintiff consistently pleaded to P.O.Santana, to stop the attack upon his
Person. But, P.O.Santana, continued to commenced the unjustified attack.
His attitude was outside the scope of his required duty to protect a cit-
zen right under a alleged arrest.

2.) Plaintiff states he was subjected to "Deliberate Indifference" and a

"Assault & Battery" claim that was inherently interefered with his 4th,

8th, and 14th U.S.C.A. for which he was unlawfully deprived of by the

Misconduct of the N.Y.P.D. and P.O.Jason Santana, on July,29th,2011.

Along with P.O. Vasquez.

3.) P.O.Santana,violated the departmental rules & regulations  when he held

Plaintiff in the choke bear hold grip. a practice that is outlawed by

The department.This claim is further confirm  by the Civilian Complaint

Reveiw  Board conducted  by Investigator Daniel Pearce,on May,9th,2012.

See,attached Exhibit-B.

The officer is in breach of the department directive policy#203-11.which

Has been attached as Exhibit-C.

when and how, and their response, if any: _____

_____
_____ See attached _____
_____ C.C.R.B report. _____
_____

G.   Please set forth any additional information that is relevant to the exhaustion of your administrative
     remedies. _____

_____
_____ C.C.R.B _____
_____ report. _____
_____
_____

**Note:**   You may attach as exhibits to this complaint any documents related to the exhaustion of your
            administrative remedies.

## V.   Relief:

State what you want the Court to do for you (including the amount of monetary compensation, if any, that you
are seeking and the basis for such amount). _____

Grant Civil complaint to be
heard before a jury trial. and if judgement
is in Plaintiff () favor, it is requested by
Plaintiff to recieve both compensation and
Punitive damages in the sum of $5 million
U.S dollars ()

_____
_____
_____
_____
_____

## VI.   Previous lawsuits:

| On these claims | A. | Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action? |

Yes _____   No ✓

B.    If your answer to A is YES, describe each lawsuit by answering questions 1 through 7 below. (If there is more than one lawsuit, describe the additional lawsuits on another sheet of paper, using the same format.)

1.    Parties to the previous lawsuit:

Plaintiff _____

Defendants _____ N/A _____

2.    Court (if federal court, name the district; if state court, name the county) _____ _____

3.    Docket or Index number _____

4.    Name of Judge assigned to your case _____

5.    Approximate date of filing lawsuit _____

6.    Is the case still pending? Yes _____ No _____
If NO, give the approximate date of disposition _____

7.    What was the result of the case? (For example: Was the case dismissed? Was there judgment in your favor? Was the case appealed?) _____
_____
_____

On other claims

C.    Have you filed other lawsuits in state or federal court otherwise relating to your imprisonment?
Yes _____ No _____

D.    If your answer to C is YES, describe each lawsuit by answering questions 1 through 7 below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same format.)

1.    Parties to the previous lawsuit:

Plaintiff _____

Defendants _____

2.    Court (if federal court, name the district; if state court, name the county) _____

3.    Docket or Index number _____

4.    Name of Judge assigned to your case _____

5.    Approximate date of filing lawsuit _____

6.    Is the case still pending? Yes _____ No _____
If NO, give the approximate date of disposition _____

7.    What was the result of the case? (For example: Was the case dismissed? Was there judgment in your favor? Was the case appealed?) _____ _____ _____
_____

Rev 05/2010

6

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___ day of __**March, 3, 2014**

|  |  |
|---|---|
| Signature of Plaintiff | *Jerod O Dumppole* |
| Inmate Number | 141-11-10574 |
| Institution Address | A.M.KC. |
|  | 18-18 Hazen St. |
|  | East Elmhurst, New York |
|  | 11370 |

**Note:** All plaintiffs named in the caption of the complaint must date and sign the complaint and provide their inmate numbers and addresses.

I declare under penalty of perjury that on this **3rd** day of __**March,** (___, 20_4_, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff: *Jerod O Dumppole*

# EXHIBIT A

*CCRB*
*Mar 09, 2012*

# IA Detailed Description

| CCRB Case # : 201114828 | Investigator :Daniel Pearce | Name of Complainant : Jerrod Drumgoole |
|---|---|---|

**Date :** 03/09/2012

**Time :** 02:33 PM

**Action :** Case investigation - Daniel Pearce

**Detailed Description :**

On February 13, 2012, the undersigned received a call from Erik Lavenburg, who provided the following phone statement:

On July 29, 2011, at approximately 7:30PM, Mr. Lavenburg went with his wife and son to visit his in-laws at their apartment building, 415 Albemarle Road in Brooklyn. Mr. Lavenburg was spackling their apartment. He realized that he had forgotten some tools after he entered the building, and so he separated from his wife and son to retrieve the tools from their car. He reentered the building shortly thereafter, and as he was exiting the elevator and walking toward his in-laws' apartment, he encountered in the hallway between the elevator and his in-laws' apartment two individuals whom he identified through parole hearings as Jerrod Drumgoole and Humphries Quaye. Mr. Drumgoole was a black male in his thirties, 6'0", with a goatee and a muscular build, and he was wearing a dark-colored sweatshirt with the hood up. Mr. Quaye was a black male with a darker complexion and rounder face than Mr. Drumgoole, in his thirties, 6'6", with an average build; Mr. Lavenburg could not recall what he was wearing.

Mr. Drumgoole placed a hand on Mr. Lavenburg's shoulder; he was holding a black handgun. He instructed Mr. Lavenburg to hand over his money. When Mr. Lavenburg began removing the cash from his wallet, Mr. Drumgoole instructed Mr. Lavenburg to give "the whole thing." Mr. Quaye reached into Mr. Lavenburg's two front pockets and removed his keys and cell phone, whereupon Mr. Quaye and Mr. Drumgoole went down the stairs. Approximately five seconds after they left, Mr. Lavenburg followed them out of the building and saw that they took a left on East 4th Street. There were many civilians on the sidewalk, and Mr. Lavenburg asked someone to call 911, explaining that he had just been mugged. One individual replied that he did not have his cell phone; as the individual said this, Mr. Lavenburg observed a marked patrol car containing two uniformed officers rounding the corner. Mr. Lavenburg was able to identify these officers because he subsequently spent much of the evening with them. The recording officer was PO Jason Santana, who was a white Hispanic male, thirty years of age, between 5'8" and 5'9", with a muscular build and dark hair. The operator was PO Jason Vasquez, who was a white Hispanic male, thirty years of age, 5'10", with a shaved head and a muscular build.

Mr. Lavenburg flagged down the patrol car. The RMP stopped at the intersection of Albemarle Road and East 4th Street. Mr. Lavenburg told the officers that he had been mugged at gunpoint. The officers instructed him to enter the vehicle while they canvassed for Mr. Drumgoole and Mr. Quaye. The officers drove about halfway down East 4th Street and stopped parallel to the legally parked gray car--Mr. Lavenburg could not recall the make or model--containing Mr. Drumgoole and Mr. Quaye, whom Mr. Lavenburg identified. East 4th is a one-way street, and the vehicle containing Mr. Drumgoole and Mr. Quaye was parked on the left side of the street. The officers exited with PO Vasquez approaching Mr. Quaye, who was in the front passenger seat, and PO Santana going around the vehicle to approach Mr. Drumgoole, who was in the driver's seat. The officers had their guns drawn. Mr. Lavenburg remained in the RMP.

PO Vasquez placed Mr. Quaye in handcuffs. PO Santana began struggling with Mr. Drumgoole, and they appeared well-matched physically, with PO Santana unable to restrain him and unable to call for backup. Mr. Lavenburg did not see how PO Santana removed Mr. Drumgoole from the vehicle. Seeing PO Santana struggling, PO Vasquez approached him to assist, whereupon PO Santana commanded, "Hold your perp," and Mr. Quaye began running from the scene toward Cherokee Avenue. PO Vasquez pursued him, and Mr. Lavenburg lost sight of them. All Mr. Lavenburg saw PO Santana doing to restrain Mr. Drumgoole was trying to keep him in a bear hug. Mr. Lavenburg did not see PO Santana use any other force against Mr. Drumgoole beside this bear hug and the subsequent pepper-spraying. He never saw Mr. Drumgoole attempt to strike PO Santana.

PO Santana could not apply handcuffs, and so Mr. Lavenburg began to step out of the RMP. He asked PO Santana if he could help. PO Santana initially did not reply, but he then asked if Mr. Lavenburg would grab Mr. Drumgoole's legs. Mr. Lavenburg exited the vehicle and grabbed Mr. Drumgoole around the ankles. This was approximately twenty seconds after PO Santana and Mr. Drumgoole began struggling. This maneuver restrained Mr. Drumgoole just enough so that PO Santana could bring him to the ground. Mr. Drumgoole landed on his stomach. Mr. Lavenburg estimated that it took

Encl. 8a

# IA Detailed Description

| CCRB Case # : 201114828 | Investigator : Daniel Pearce | Name of Complainant : Jerrod Drumgoole |
| --- | --- | --- |

Santana could bring him to the ground. Mr. Drumgoole landed on his stomach. Mr. Lavenburg estimated that it took between five and ten seconds to bring Mr. Drumgoole to the ground. Mr. Drumgoole would not put his hands behind his back, keeping them by his sides or in front of him, even after he was on the ground. PO Santana removed his pepper spray and pepper-sprayed Mr. Drumgoole shortly after Mr. Drumgoole landed. Mr. Lavenburg closed his eyes at this time because he was worried he would get pepper spray in his eyes. Mr. Lavenburg opened his eyes and Mr. Drumgoole had been successfully placed in handcuffs. (Other than this, Mr. Lavenburg had a clear view of the entire incident.) Mr. Lavenburg believed that another unidentified civilian assisted in the restraining of Mr. Drumgoole, though he did not see what, if anything, this individual did; the individual was a white male in his forties.

No other police officers assisted in the handcuffing; many unidentified officers in many vehicles then arrived after Mr. Drumgoole had been effectively handcuffed. Mr. Lavenburg stood up and glanced into Mr. Drumgoole's vehicle. He saw the handgun that had been used during the mugging wedged between the driver's side door and the driver's seat. Mr. Lavenburg then spent the following six hours at the stationhouse filling out reports.

Mr. Lavenburg insisted that there was nothing inappropriate about PO Santana's behavior, and he was surprised to hear that a CCRB complaint had been filed regarding this incident.

Encl. _____ 86

# EXHIBIT B

"N.Y.P.D. Directive#P.G. 203-11 regarding Use of Force Protocol"

P.G. 203-11 Use Of Force

Date Effective: 01-01-00

USE OF FORCE

All uniformed members of the service are responsible and accountable for the proper use of force under appropriate circumstances. Members of the service are reminded that the application of force must be consistent with existing law and with New York City Police Department Values, by which we pledge to value human life and respect the dignity of each individual. Depending upon the circumstances, both federal and state laws provide for criminal sanctions and civil liability against uniformed members of the service, when force is deemed excessive, wrongful or improperly applied.

The primary duty of all members of the service is to preserve human life. Only that amount of force necessary to overcome resistance will be used to effect an arrest or take a mentally ill or emotionally disturbed person into custody. Deadly physical force will be used ONLY as a last resort and consistent with Department policy and the law.

At the scene of a police incident, many members of the service may be present and some members may not be directly involved in taking police actions. However, this does not relieve any member present of the obligation to ensure that the requirements of the law and Department regulations are complied with. Members of the service are required to maintain control or intervene if the use of force against a subject clearly becomes excessive. Failure to do so may result in both criminal and civil liability. EXCESSIVE FORCE WILL NOT BE TOLERATED.

All members of the service at the scene of a police incident must:

  a. Immediately establish firearms control

  b. Use minimum necessary force

  c. Employ non-lethal alternatives, as appropriate.

Members of the New York City Police Department will NOT use chokeholds. A chokehold shall include, but is not limited to, any pressure to the throat or windpipe, which may prevent or hinder breathing or reduce intake of air. Whenever it becomes necessary to take a violent or resisting subject into custody, responding officers should utilize appropriate tactics in a coordinated effort to overcome resistance (for example see P.G. 216-05, "Aided Cases-Mentally Ill or Emotionally Disturbed Persons"). The patrol supervisor, if present, should direct and control all activity. Whenever possible, members should make every effort to avoid tactics, such as sitting or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe.

Persons taken into custody (i.e., arrest, mentally ill, emotionally disturbed, etc.) shall be rear cuffed at the earliest opportunity to reduce the potential for resistance, which may cause injuries. In addition, alternate restraining devices (Velcro straps, mesh restraining blankets, etc.) shall be used, at the earliest opportunity, to restrain or further restrain a subject whose actions or behavior may cause injury to himself/herself or others.

After an individual has been controlled and placed under custodial restraint

Encl. _____ 1a

using handcuffs and other authorized methods, the person should be positioned so as to promote free breathing. The subject should not be maintained or transported in a face down position.

The member assuming custody of the subject should closely observe him or her for any apparent injuries. If the area is dark, a flashlight or other source of illumination should be used to maintain a clear view of the subject at all times.

If a person appears to be having difficulty breathing or is otherwise demonstrating life-threatening symptoms, medical assistance will be requested immediately. The patrol supervisor will direct that alternate means to maintain custody be utilized, if appropriate.

The use of restraints to "hog-tie" (restraining person by connecting or tying rear cuffed hands to cuffed or shackled ankles or legs) subjects and the transportation of subjects in a face down position within any vehicle are prohibited.


P.G. 212-95 Use Of Pepper Spray Devices


Date Effective: 01-01-00

PURPOSE

To inform uniformed members of the service of circumstances under which pepper spray may be intentionally discharged and to record instances where pepper spray has been discharged, intentionally or accidentally.

SCOPE

Use of Oleoresin Capsicum (O.C.) pepper spray constitutes physical force under the New York State Penal Law. Use of pepper spray is proper when used in accordance with Article 35 of the Penal Law and Department procedures. O.C. pepper spray may be used when a member reasonably believes it is necessary to effect an arrest of a resisting suspect, for self-defense or defense of another from unlawful force, or to take a resisting emotionally disturbed person into custody. In many cases, pepper spray will reduce or eliminate the need for substantial physical force to effect an arrest or gain custody. It will often reduce the potential for injuries to members and suspects that may result from physical restraint and it should be regarded as a possible alternative to such force and restraint, where practical. Pepper spray shall not be used in situations that do not require the use of physical force. O.C. pepper spray may be used in arrest or custodial restraint situations where physical presence and/or verbal commands have not been, or would not be, effective in overcoming physical resistance.

PROCEDURE

When necessary to use pepper spray device:

UNIFORMED MEMBER OF THE SERVICE

1. Hold pepper spray in an upright position, aim and discharge pepper spray into a subject's eyes for maximum effectiveness, using two (2) one second bursts, at a minimum distance of three (3) feet, and only in situations when the uniformed member of the service reasonably believes that it is necessary to

Encl. ___16___

# EXHIBIT C

"P.O.Santana Admission of Using Physical Force upon PLaintiff during -
Direct examination by Prosecutor Kurtzberg at the Trial Proceeding."

1      A.    He was still trying to get away, fighting.

2      Q.    Was he moving his arms, moving his feet, what was he

3   doing?

4      A.    He was just trying to take off.

5            MR. SHEINBERG:   Objection, your Honor.

6            THE COURT:   The objection is sustained.

7      Q.    What was he doing with his arms, Officer Santana?

8      A.    He was flailing his arms, he was kicking.  He was

9   trying to get away.

10           MR. SHEINBERG:   Again, I will object.

11           THE COURT:   The objection is sustained with

12     reference to what he was trying to do.  The officer can't

13     testify to the defendant's state of mind.

14     Q.    What did you do when Defendant Drumgoole was flailing

15   his arms and kicking?

16     A.    That is when I decided to use my ASP.

17     Q.    Did you use anything else?

18     A.    Yes.

19           THE COURT:   Your what?

20           THE WITNESS:  ASP.

21           THE COURT:   What is that?

22           THE WITNESS:  My ASP is this, it is like this

23     (Indicating).

24           THE COURT:   Well, just tell us what it is.

25           THE WITNESS:  It is a collapsable baton.

P.O. Santana-Kurtzberg-Direct/Yellow & Orange Juries[186]

1    THE COURT:   It is a baton, okay.

2    THE WITNESS:   (Indicating)

3    Q.   How did you use your the collapsable baton?

4    A.   I used it as he was fighting with me.  I used that.

5    That didn't work.  He was still resisting and then I used my

6    mace and finally that is when he gave his arms.

7    Q.   Were you able to handcuff him?

8    A.   I was able to handcuff him.

9    Q.   Did you handcuff him in the front or in the back?

10   A.   In the back.

11   THE COURT:   And just explain what the mace is.

12   THE WITNESS:   Mace is pepper spray.

13   THE COURT:   What effect does it have?

14   THE WITNESS:   It irritates the eyes and affects

15   your breathing.

16   Q.   Officer Santana, I want to go back for a second and

17   have you shown what I have premarked as People's 12 through 15

18   for identification.

19   THE COURT OFFICER:   (Handing)

20   Q.   Officer Santana, do you recognize what I premarked as

21   People's 12, 13, and 14 for identification?

22   A.   Yes.

23   Q.   What are they?

24   A.   These are pictures of where the incident took place.

25   MR. SHEINBERG:   I can't hear.  Can you speak

# EXHIBIT D

"Personal Medical Photograph's of Plaintiff Body Injurie's"

```
Name    : DRUMGOOLE,JERROD              MRN: 0001363363
DOB/SEX: MAY 5,1974, MALE               ACT: 1121100030
HOSP    : LUTHERAN MEDICAL CENTER       ADM: Jul 30,2011 02:59
ATTENDING:
------------------------------------------------------------------------
```

Exm Date: JUL 30,2011@06:28:03
Req Phys: MARSHALL,KIAH                 Pat Loc: EMERGENCY DEPARTMENT (Req'g Lo
                                        Img Loc: RADIOLOGY ER
                                        Service: Unknown


(Case 30874 COMPLETE)CHEST ROUTINE              (RAD   Detailed) CPT:71020

    Clinical History:
      s/p assault


      Location: Area N

    Report Status: Verified          Date Reported: JUL 30,2011
                                     Date Verified: JUL 30,2011

    Verifier E-Sig:

    Report:
      History- status post assault.

      Chest PA and lateral views.

      Cardiac size is normal. The lungs are well aerated and show no
      active infiltrates, consolidations or pleural effusions. There is
      no pneumothorax.  There is a questionable superior subluxation of
      the acromial end of left clavicle.

      IMPRESSION

      No than consolidation or pleural effusion.

       Questionable superior subluxation of the acromial end of left
      clavicle.




    Impression:
      SEE REPORT

    Primary Diagnostic Code:

  Primary Interpreting Staff:
    IGOR FISHKIN, PHYSICIAN
            Verified by IGOR FISHKIN
    /IF


                  ----- KNEE RIGHT -----

  Exm Date: JUL 30,2011@06:28:04
  Req Phys: MARSHALL,KIAH                 Pat Loc: EMERGENCY DEPARTMENT (Req'g Lo
                                          Img Loc: RADIOLOGY ER
```

Encl. _____ 13ρ

# EXHIBIT E

"Plaintiff interveiw with the Civilian Complaint Reveiw Board"

*Mr. Drumgoole was interviewed at Rikers Island on December 22, 2011. Mr. Drumgoole is a thirty-seven-year-old black male, standing five feet, ten inches tall, weighing two-hundred-five pounds, with black hair and brown eyes.*

At approximately 6:50 p.m. on July 29, 2011, Mr. Drumgoole was with his fiancée, Ms. Shenee Briggs at a nail salon on Church Avenue in Brooklyn, near East 4th Street. He was there for approximately an hour. On that day, Mr. Drumgoole was wearing a black t-shirt, blue jeans and sneakers. On his person, he only had his wallet in his back right pocket and his cell phone on a belt clip. Previously, he had given his friend, Mr. Humphries Quaye a ride to the area and then went to the nail salon to bring the car seat to his fiancée, so she could pick her child up. He also noted that Ms. Briggs worked in the area. Mr. Drumgoole described Mr. Quaye as a thirty-two year old black male, standing over five feet, ten inches tall, with a slim build. Mr. Drumgoole left the salon and walked on Church Avenue to East 4th Street, where he made a left turn and started to walk to his vehicle, which was parked on East 4th Street, between Church Avenue and Albemarle Road. East 4th Street is primarily a residential street. Mr. Drumgoole believes that there may have been a video camera on the street. En route, Mr. Drumgoole did not speak or interact with anyone. As Mr. Drumgoole walked on Church Avenue towards his vehicle, Mr. Quaye happened to be walking towards Mr. Drumgoole's vehicle as well, but was coming from the opposite direction, approaching from Albemarle Road. Mr. Quaye asked Mr. Drumgoole to drop him off, but Mr. Drumgoole informed him that he was leaving. Mr. Drumgoole entered his vehicle and Mr. Quaye entered the vehicle as well.

At that point, a marked patrol car, containing two officers, identified by Mr. Drumgoole as PO "Vasquez" and PO "Santana" drove past Mr. Drumgoole's vehicle. Mr. Drumgoole described PO Santana as a Hispanic male in his late twenties or early thirties, standing five feet, nine inches tall, with black hair, and dressed in uniform. Mr. Drumgoole thought he was the driver, but couldn't remember. Mr. Drumgoole could only describe PO Vasquez as a bald Hispanic male. The patrol car then stopped, reversed, and stopped again next to Mr. Drumgoole's vehicle. PO Santana exited the vehicle and walked around to Mr. Drumgoole's driver's side window. PO Santana asked Mr. Drumgoole to open his door and Mr. Drumgoole complied. Mr. Drumgoole then asked the officer why he was being stopped and PO Santana grabbed Mr. Drumgoole by the left side of the chest of his shirt and left upper arm and pulled him out of the vehicle, causing him to fall to one knee on the sidewalk. PO Santana then lifted Mr. Drumgoole to his feet, put him against the car, and tried to rear handcuff him. PO Santana called Mr. Drumgoole a "motherfucker" as he told him to get against the car. Mr. Drumgoole turned his head behind him to ask the officer what he was being stopped for. Mr. Drumgoole denied resisting being handcuffed and stated that he only turned his head, while PO Santana held his arms.

There were several civilians looking on (Mr. Drumgoole could not estimate how many and did not recognize anyone). PO Santana then called out to them to aid him. Two civilians aided the officer, one of whom placed Mr. Drumgoole in a head lock and the other grabbed Mr. Drumgoole by the legs from the side. Mr. Drumgoole did not recall the individuals' appearances, but recalled that they were white males and the individual who put him a headlock looked older than the other individual. As he fell, Mr. Drumgoole extended his arms to the ground to brace his fall and fell onto his arms. Mr. Drumgoole's hands were pinned under him as he lay, chest down, on the floor, with one civilian restraining his legs and the other civilian keeping him in a headlock and pressing his weight on Mr. Drumgoole. While he was restrained, PO Santana repeatedly hit Mr. Drumgoole in the face and torso with an asp (described by Mr. Drumgoole as a black stick that extended). Mr. Drumgoole did not recall where or how many times he was hit, but during the interview, he showed four photos of his injuries, taken in August 2011. One photo shows a purple bruise on the side of his right upper arm. Another shows a large purple bruise on the left triceps, and the last two photos show a bruise on Mr. Drumgoole's right forearm. Additionally PO Santana kicked Mr. Drumgoole in the left side of his jaw, causing his lip to swell. Mr. Drumgoole did not recall the order in which he was hit by the asp and kicked, but only remembered that it occurred while he was on the ground. Later in the interview, Mr. Drumgoole stated that he was kicked in the face, then hit with an asp and then pepper sprayed. PO Santana then held his pepper spray two to three inches away from Mr. Drumgoole's face and sprayed him in the eyes. PO Santana asked Mr. Drumgoole for his hands, and Mr. Drumgoole informed him that his hands were pinned under his body. Then the individual who was pressing his weight on Mr. Drumgoole released the pressure and PO Santana took Mr. Drumgoole's hands and handcuffed him. Mr. Drumgoole did not lose consciousness at any point during the incident.

PO Santana stood Mr. Drumgoole up and approximately four more marked vehicles arrived. One of the officers who arrived, described as a Hispanic male, told PO Santana, "This is why we get in trouble. We can't be doing this." Mr. Drumgoole's chain was removed along with his two wedding bands, one of which was never returned to him. Mr. Drumgoole was transported to a precinct station house (he did not recall which) in a marked patrol car by two officers, PO1 who was driving, and PO2 who was a

Encl. _____ 7b

passenger. PO1, a Hispanic female officer with a slender build and shorter than Mr. Drumgoole, wiped the pepper spray out of Mr. Drumgoole's eyes. Mr. Drumgoole described PO2 as a white male. Mr. Drumgoole was unsure of what happened to Mr. Quaye. He later heard that Mr. Quaye fled the area, but did not see any of his interaction with officers.

At the station house, several officers, including PO Vasquez, processed Mr. Drumgoole's arrest, and Mr. Drumgoole told an officer who had markings on the sleeve of his uniform that he needed medical attention. Mr. Drumgoole was then transported to a hospital in the vicinity of the precinct (he did not recall which one), where he received a CAT scan to the head and X-rays of his arms and ribs. He did not receive any treatment for his injuries.

Encl. _7c_



# UNITED STATES DISTRICT COURT
### Eastern DISTRICT OF NEW YORK

# PRISONER AUTHORIZATION

Case Name: _Jerrod Drumgoole_ v. _City of New York P.O. Jason Santana, Et. Al._
*(Enter the full name of the plaintiff(s))* *(Enter the full name of the defendant(s))*

Docket No: No. _____ Civ. _____ ( )
*(Enter the docket number, if available; if filing this with your complaint, you will not have a docket number.)*

     The Prison Litigation Reform Act ("PLRA" or "Act") amended the *in forma pauperis* statute (28 U.S.C. § 1915) and applies to your case. Under the PLRA, you are required to pay the full filing fee when bringing a civil action if you are currently incarcerated or detained at any facility. If you do not have sufficient funds in your prison account at the time your action is filed, the Court must assess and collect payments until the entire filing fee of $350.00 has been paid, no matter what the outcome of the action.

.SIGN AND DATE THE FOLLOWING AUTHORIZATION:

     I, _Jerrod Drumgoole_ *(print or type your name)*, request and authorize the agency holding me in custody to send to the Clerk of the United States District Court for the Southern District of New York, or, if this matter is transferred to another district court, to the Clerk of the transferee court, a certified copy of my prison account statement for the past six months. I further request and authorize the agency holding me in custody to calculate the amounts specified by 28 U.S.C. § 1915(b), to deduct those amounts from my prison trust fund account (or institutional equivalent), and to disburse those amounts to the United States District Court for the Southern District of New York. This authorization shall apply to any agency into whose custody I may be transferred, and to any other district court to which my case may be transferred and by which my poor person application may be decided.

     I UNDERSTAND THAT BY SIGNING AND RETURNING THIS NOTICE TO THE COURT, THE ENTIRE COURT FILING FEE OF $350.00 WILL BE PAID IN INSTALLMENTS BY AUTOMATIC DEDUCTIONS FROM MY PRISON TRUST FUND ACCOUNT EVEN IF MY CASE IS DISMISSED OR EVEN IF I VOLUNTARILY WITHDRAW THE CASE.

**MARCH 3rd** , 20 14
*Date signed*

_Jerrod Drumgoole_
*Signature of Plaintiff*

_141-11-10574_
*Prisoner I.D. Number*

_A.M.K.C. 18-18 Hazen street_
*Name of current facility*

_East Elmhurst, New York 11370_

*rev. 01/11*